UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KARL VICTOR WATKINS,          )
                                 )
      Plaintiff              )
                                 )
      v.                 )
                                 )  Civil Action No. 3:16-cv-30117-KAR
                                 )
NANCY A. BERRYHILL,           )
Acting Commissioner of Social Security      )
Administration,                 )
                                 )
      Defendant             )

<u>MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE DECISION OF
THE COMMISSIONER</u>
(Dkt. Nos. 12 & 17)

ROBERTSON, U.S.M.J.

       Before the court is an action for judicial review of a final decision by the Acting

Commissioner of the Social Security Administration ("Commissioner") regarding an individual's

entitlement to Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3). Plaintiff Karl Victor Watkins ("Plaintiff") asserts that the Commissioner's decision

denying him such benefits -- memorialized in a March 3, 2015 decision of an administrative law

judge ("ALJ") -- contains legal error and is not supported by substantial evidence. Specifically,

Plaintiff alleges that the ALJ erred by failing to: (1) adopt the 2012 decision of another ALJ who

found Plaintiff disabled; (2) fully adopt the opinions of the state agency examiners and a

consultant when crafting Plaintiff's RFC; and (3) afford a treatment provider's opinion

controlling weight. Plaintiff has moved for judgment on the pleadings (Dkt. No. 12), while the

Commissioner has moved to affirm (Dkt. No. 17).

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will DENY the Commissioner's motion to affirm, and ALLOW Plaintiff's motion for judgment on the pleadings to the extent it seeks a remand on a single issue.

## I.    Procedural Background

Plaintiff first applied for SSI on July 16, 2010 alleging an onset of disability on May 2, 2008 (Administrative Record "A.R." at 87). On February 24, 2012, after a hearing, ALJ Judith M. Stolfo (hereinafter "first ALJ") found Plaintiff to be disabled (*id.* at 21, 79-87). However, Plaintiff's SSI benefits were suspended because he did not meet the financial eligibility standard for the SSI program and they were ultimately terminated (A.R. at 21-22 & nn.3 & 4; Dkt. No. 18-1 ¶ 4(f)). *See* 42 U.S.C. § 1382(a).

Plaintiff submitted a second application for SSI on August 13, 2013, when he was 49 years old, again alleging an onset of disability on May 2, 2008 (*id.* at 19, 26). In his second SSI application, Plaintiff alleged that he was disabled due to depression, anxiety, and paranoia (*id.* at 88). The application was denied initially on January 16, 2014 and upon reconsideration on June 4, 2014 (*id.* at 19). Following a hearing before a different ALJ (hereinafter "second ALJ" or "ALJ") on February 17, 2015, the second ALJ issued his decision on March 3, 2015 finding Plaintiff was not disabled since the application was filed on August 13, 2013 (*id.* at 19). On April 28, 2016, the Appeals Council denied review of the ALJ's decision (*id.* at 1), and this appeal followed.

## II.    Factual Background

In support of the disabling conditions listed in Plaintiff's application for SSI benefits, he presented the second ALJ with medical evidence spanning the period from 2010 through 2014.[1]

A.    Treatment Providers

Plaintiff was treated by Valley Psychiatric Service, Inc. ("VPS") beginning in March 2010 (*id.* at 83, 366).  On April 17, 2013, Plaintiff's treatment provider Glenroy Bristol completed a "Brief Psychiatric Rating Scale for Adults" (*id.* at 350).  Plaintiff's anxiety was "moderately severe," his depression was "moderate," and his conceptual disorganization was "very mild" (*id.*).  Plaintiff displayed no indication that he suffered from hallucinations, unusual thought content, bizarre behavior, self-neglect, disorientation, and distractibility (*id.*).

Plaintiff's therapist, Glenroy Bristol, completed Plaintiff's mental status exam at VPS on July 1, 2013 (*id.* at 290).  Plaintiff was oriented x 3 (*id.*).  Although Plaintiff reported experiencing auditory hallucinations "'once in a while,'" they were not "command hallucinations" and he did not understand what he heard (*id.*).  His behavior, speech, mood/affect, and thought content were within normal limits (*id.*).  His mood was stable, his thought processes were logical and rational, he was well-rested, his appetite was good, and he had no current SI/HI (*id.*).  Mr. Bristol noted that Plaintiff was "pleasant and in good spirits" (*id.*).  According to Plaintiff, his medications -- Wellbutrin, Risperdal, Cogentin, Trazodone, and Hydroxyzine -- were effective, but because Trazodone was upsetting his stomach, his dosage was decreased (*id.*).

---

[1] Although Plaintiff crushed his right hand and lost a portion of his pinky finger while working at a saw mill in 1994 (A.R. at 43), his challenge to the ALJ's denial of benefits focuses solely on his alleged mental impairments.  Accordingly, the summary of evidence is limited to medical records relevant to the issues raised by Plaintiff in this appeal.

During a VPS session on July 24, 2013, Plaintiff's "mood was euthymic with bright affect, he denied [SI/HI] intent or plan, [he] did not express or exhibit signs of psychosis, [and his] thoughts were clear, logical, organized, and reality base[d]" (*id.* at 287).

Plaintiff terminated service with VPS on August 14, 2013 because he failed to comply with VPS's attendance policy (*id.* at 287, 288).  The discharge summary noted that Plaintiff "was medication compliant throughout treatment and was clinically stable when last seen" (*id.*).  He was diagnosed with schizoaffective disorder and polysubstance dependence (*id.* at 288).  Further, post-traumatic stress disorder ("PTSD"), intermittent explosive disorder, and antisocial personality disorder were to be ruled out (*id.* at 288).

Plaintiff returned to VPS on November 4, 2013 when he reported flashbacks, auditory and visual hallucinations, and paranoia in social settings (*id.* at 316, 325).  He also complained of "severe [recent] memory problems" (*id.* at 316).  According to the intake assessment that Mr. Bristol completed, Plaintiff was not taking medication (*id.* at 319).  His mental status examination showed that he was oriented x 3 and his appearance, eye contact, speech, perception, and orientation were within normal limits (*id.* at 321, 325).  He did not report delusions or hallucinations during the session, but was depressed, restless, and anxious, and experienced racing thoughts, impaired concentration, and "some" (as opposed to "severe") impairment of judgment (*id.* at 321, 325).  He also reported difficulty falling or staying asleep (*id.* at 323, 325).  The intake record also indicated that Plaintiff last drank alcohol about one month before the assessment and stopped smoking crack cocaine in 2010 (*id.* at 329).  Mr.

Bristol diagnosed Plaintiff as having schizoaffective disorder and PTSD and assigned him a Global Assessment of Functioning ("GAF") score of 56 (*id.* at 325).[2]

Elizabeth Benedict of the Center for Human Development ("CHD") conducted an Outpatient Adult Comprehensive Assessment of Plaintiff on February 4, 2014 (*id.* at 298). Plaintiff complained of anxiety and "mood swings" (*id.* at 302). Ms. Benedict described Plaintiff as "friendly and talkative" (*id.* at 301). He reported sleeping only one to two hours each night and experiencing difficulty leaving his home due to "panic and anxiety" (*id.* at 302-03). Ms. Benedict diagnosed Bipolar I Disorder, most recent episode mixed, severe with psychotic features and a GAF score of 45 (*id.* at 303).[3]

On May 5, 2014, Aisha Ellis, NP of CHD's Caring Health Center saw Plaintiff for an office visit to establish primary care, including medication (*id.* at 310, 312). Plaintiff reported being "a little off" because he had not taken Risperidone and Trazodone in two weeks (*id.* at 310). The record of Plaintiff's behavioral assessment indicated that Plaintiff suffered from insomnia, but was "[n]egative for depression," nervousness, and anxiety (*id.* at 310). He was

---

[2] The GAF "scale is used to rate a patient's 'overall psychological functioning.'" *Lopez-Lopez v. Colvin,* 138 F. Supp. 3d 96, 98 n.4 (D. Mass.), *on reconsideration in part,* 144 F. Supp. 3d 260 (D. Mass. 2015) (quoting American Psychiatric Institute, Diagnostic & Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994)). "The scale goes from '1,' indicating that the patient has a 'persistent danger of severely hurting self or others,' to '100,' indicating 'superior functioning.'" *Id.* (quoting DSM-IV at 32). A GAF score of 51-60 indicates: "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

[3] A GAF score of 41-50 indicates: "**Serious symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." DSM-IV at 34.

oriented x 3 and his mood and affect, behavior, judgment, and thought content were normal (*id.* at 311). He was prescribed Risperidone and Trazodone (*id.* at 312).

On May 14, 2014, Kimberly Gage, APRN, conducted Plaintiff's medication evaluation at CHD (*id.* at 390). Plaintiff complained of sleep disturbance, hearing voices that "sound like 'a lot of scrambling,'" but not commands, and depression (*id.* at 390, 392, 393). He was euthymic, oriented x 3, and his recent and remote memory and his attention/concentration were fair (*id.* at 392, 393). His speech was within normal limits and he displayed no problems with his receptive or expressive language (*id.* at 392). His thinking was "somewhat concrete but clear and organized," and his associations were intact (*id.*). Plaintiff reported experiencing racing thoughts during the two weeks he was not taking Risperidone (Risperdal), but the racing thoughts decreased once he resumed taking Risperidone (*id.* at 392, 393). Because Plaintiff was unaware that Risperidone was also prescribed for mood symptoms, he was taking it once daily instead of twice daily as prescribed (*id.* at 392). Plaintiff was diagnosed with Bipolar I Disorder, most recent episode mixed, severe with psychotic features, cognitive disorder NOS, and learning disorder NOS, and was again assigned a GAF score of 45 (*id.* at 392). APRN Gage directed him to continue with his medication with the adjustment to the Risperidone dose (*id.* at 393).

APRN Gage saw Plaintiff at CHD again on July 8, 2014 for a medication follow-up (*id.* at 385). Plaintiff was oriented x 3, was "pleasant and in good spirits," his thinking was concrete, clear, and organized, his mood was stable, his memory and attention/concentration were fair, and his judgment and insight were "fair to poor depending on context" (*id.* at 386-87). His speech, sleep, and appetite were within normal limits (*id.* at 386). He reported occasionally hearing his wife calling his name and was drinking about four beers a day (*id.* at 386-87). His diagnoses and GAF score remained unchanged (*id.* at 387).

On September 11, 2014, Peter Landstrom, RNP, of CHD assessed Plaintiff and reviewed his medications (*id.* at 380, 384). Plaintiff reported that he was feeling well and his medication was effective, but he continued to hear unintelligible voices (*id.* at 380). He reported that he occasionally smoked marijuana and had not drunk any alcohol in one month (*id.*). Plaintiff also reported that he liked to watch "old westerns," and did not leave home much, but took daily walks with his wife (*id.* at 380). The records show that Plaintiff was euthymic and was oriented to all spheres (*id.* at 381-82). His speech and thought processes were normal, his memory was intact, his attention/concentration were good, and his judgment and insight were fair (*id.* at 381). His diagnoses and GAF score remained the same as on May 14, 2014, and RNP Landstrom recommended that Plaintiff continue with his current medication regimen and his therapy with "Marcus" (*id.* at 382). Plaintiff resisted Mr. Landstrom's suggestion that he increase his activities (*id.*).

Aisha Ellis, NP, examined Plaintiff at the Caring Health Center on October 6, 2014 (*id.* at 398). He was alert, oriented x 3, and reported feeling well and continuing to maintain sobriety (*id.*). His mood, affect, judgment, and thought content were normal (*id.*).

Plaintiff visited NP Ellis again on November 10, 2014 (*id.* at 396). He told her that he drank ten to fifteen cups of coffee a day, but did not drink water, and had experienced dizziness and sweating on one occasion when he ate an entire cheesecake (*id.*). He was oriented x 3, and his mood, affect, and behavior were normal (*id.* at 396-97). He was diagnosed with prediabetes and was prescribed metformin (*id.* at 397).

B.    Marcus Foster's Opinion

On May 2, 2014, Marcus Foster completed a Mental Impairment Questionnaire, some of which is illegible (*id.* at 305). Foster had been treating Plaintiff in one hour weekly therapy

sessions since February 28, 2014 (*id.*). Plaintiff's diagnosis was Bipolar I with a GAF score of

45 (*id.*). Plaintiff was being effectively treated with these psychotropic medications: Bupropion;

Hydroxyzine; Risperidone; Sertraline HCL; and Trazodone (*id.*). The only side effect was "sleep

disturbance leading to fatigue" (*id.*). The legible prognosis was "[c]hronic, severe mental illness

requiring high level of outpatient care indefinitely" (*id.*).

Foster checked the boxes indicating the presence of the following signs and symptoms:

pervasive loss of interest in all activities; decreased energy; feelings of guilt or worthlessness;

generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent

nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control, or

sensation; recurrent obsessions or compulsions which are a source of marked distress; emotional

withdrawal or isolation; bipolar syndrome with a history of episodic periods manifested by the

full symptomatic picture of both manic and depressive syndromes; hallucinations or delusions;

vigilance and scanning; easy distractibility; memory impairment; sleep disturbance; oddities of

thought, perception, speech, or behavior; decreased need for sleep; and recurrent severe panic

attacks (*id.* at 306). Foster further indicated that Plaintiff did not have a low IQ or reduced

intellectual functioning (*id.* at 307).

According to the boxes Foster checked on the form, Plaintiff had "marked" restrictions on

his daily living activities and in maintaining social functioning and "extreme" difficulty in

maintaining concentration, persistence, or pace (*id.*). In addition, Foster checked the box

indicating Plaintiff had a "[m]edically documented history of chronic organic mental,

schizophrenic, etc., or affective disorder of at least 2 years' duration that has caused more than a

minimal limitation of ability to do any basic work activity, with symptoms or signs currently

attenuated by medication or psychosocial support, and one of the following . . ." but Foster did

not check any of the three choices that followed the statement (*id.* at 307-08). Mr. Foster anticipated that Plaintiff would be absent from work for more than four days per month (*id.* at 308). Mr. Foster further stated that Plaintiff could manage benefits (*id.*).

      C.      <u>Consultative Examination and State Agency Consultants</u>

          1.      Victor Carbone, Ph.D.

Victor Carbone, Ph.D., examined Plaintiff on January 14, 2014 (*id.* at 292). Plaintiff reported being paranoid, anxious, depressed, and hypervigilant, and suffering from flashbacks of the events that occurred while he was incarcerated for seventeen years in Alabama (*id.* at 292, 293, 295). Plaintiff told Dr. Carbone that he experienced racing thoughts and heard mumbling voices in his head (*id.* at 293, 295). He also indicated difficulties with concentration and memory (*id.* at 295, 296). During the mental status exam, Plaintiff was oriented x 3, but was unable to complete a Mini Mental Status Examination because he reported that he could not spell and his "academics" were weak (*id.* at 295). Dr. Carbone noted that Plaintiff's "[i]nsight into his difficulties were quite limited" (*id.* at 296).

Plaintiff initially denied any past substance abuse (*id.* at 293). After Dr. Carbone indicated that his history suggested drug use, Plaintiff acknowledged that he began using powder cocaine when he was 22 or 23, used crack cocaine until he was incarcerated, used again after he was released, and stopped using in 2011 (*id.*). He smoked two packs of cigarettes a day (id. at 294).

Dr. Carbone noted that Plaintiff understood simple directions, but had "more difficulty with complex concepts and [got] overwhelmed very easy with much tearfulness during the evaluation" (*id.* at 296). According to Dr. Carbone, Plaintiff's anxiety "would certainly impact his ability to focus . . ." (*id.*). Dr. Carbone diagnosed depressive disorder NOS and likely

borderline intellectual functioning, bipolar disorder NOS was to be ruled out, and PTSD and cocaine dependence were indicated by the history Plaintiff supplied (*id.*). Dr. Carbone assigned a GAF score of 52 (*id.*).

### 2. Joseph Whitehorn, Ph.D.

Joseph Whitehorn, Ph.D., a Disability Determination Services ("DDS") consultant, reviewed Plaintiff's treatment records on January 16, 2014 (*id.* at 98). He determined that Plaintiff had moderate restrictions on daily living activities, moderate difficulties in maintaining social functioning and concentration, persistence, and pace, and had experienced no repeated episodes of decompensation (*id.* at 93). Dr. Whitehorn reported that Plaintiff's memory and understanding were adequate for simple tasks (*id.* at 94). He further opined that Plaintiff was able to "sustain pace and focus on simple tasks for two hour periods during a work day," "adhere to social norms in a work setting," and "handle changes in simple work routines" (*id.* at 95-96).

In making these determinations, Dr. Whitehorn principally relied on Plaintiff's mental status exams that were conducted on July 1 and 24, 2013 and indicated that "reports of serious [symptoms] given at [the] current [consultative examination] are somewhat doubtful" (*id.* at 96). Dr. Whitehorn also noted the discrepancy between Plaintiff's function report that said he was too nervous to go out alone and his treatment providers' and Dr. Carbone's reports that fail to mention this impairment (*id.* at 96). Dr. Whitehorn indicated that "details or data" to support Plaintiff's diagnoses of schizoaffective disorder and intermediate explosive disorder were absent from his treatment records (*id.* at 96). Dr. Whitehorn diagnosed: depressive disorder NOS; PTSD; probable borderline intellectual function; and substance addiction disorder, in remission (id. at 96). Dr. Whitehorn opined that Plaintiff was not disabled (*id.* at 98).

### 3. Lawrence Langer, Ph.D.

Lawrence Langer, Ph.D., conducted a state agency assessment on June 4, 2014 (*id.* at 109, 111).  Dr. Langer's opinions mirrored Dr. Whitehorn's determinations of Plaintiff's degree of difficulty with daily living activities, maintaining social functioning, and maintaining concentration, persistence, or pace, and of Plaintiff's limitations on memory, concentration and persistence, social interactions, and ability to adapt (*id.* at 106, 108-09).  Like Dr. Whitehorn, Dr. Langer opined that Plaintiff was not disabled (*id.* at 111).

D.     Function Reports

1.     Lynn McGovern Watkins

Plaintiff's former wife, Lynn McGovern Watkins, completed a third party function report form on August 18, 2013 (*id.* at 227).  She had known Plaintiff for eight to ten years and indicated that he spent his days drinking coffee, taking medications, watching TV, pacing, and sitting on the porch during nice weather (*id.*).  She observed that his legs shook, his sleep was disrupted, and he was "afraid to leave [the] house" (*id.* at 227, 228, 230).  She also observed him opening doors two or three times before he exited (*id.* at 233).  He had no problems with personal care, but sometimes needed reminders to shower and to brush his teeth, although he did not require reminders to take his medications (*id.* at 228-29).  He was able to prepare his meals each day, perform household chores if reminded, and handled his finances (*id.* at 229, 230).  Although he shopped once each month, he "rushe[d]" out of stores because he "hate[d] crowds" (*id.* at 230).  He socialized with "one person at a time" twice a week, but had no problems getting along with others (*id.* at 231, 232).

Mrs. Watkins noted that Plaintiff had difficulty completing tasks, concentrating, remembering and following written instructions, and getting along with others, although he could

follow spoken instructions and get along with authority figures unless they made him nervous (*id.* at 232, 233). He was not able to handle stress or changes in routine (*id.* at 233).

   2.   Plaintiff

Plaintiff completed a function report on May 12, 2014 (*id.* at 258). He noted that his daily activities included pacing, looking out the door, sitting on the porch sometimes, and watching TV (*id.* at 251, 255). He was able to prepare his own meals every day and perform household chores with help and encouragement (*id.* at 253). He went out every week, but was nervous, and rode in a car and used public transportation (*id.* at 254). His anxiety prevented him from driving (*id.*). He stated that he had no problems with personal care and did not require reminders to take care of personal needs and grooming, but needed reminders to take his medication (*id.* at 252, 253). Although he visited his former wife and her family at least three times per week, he sometimes got anxious and paranoid when he was around people (id. at 255, 256). At times, he rocked or shook when he was anxious (*id.* at 257).

Plaintiff reported limits on his ability to walk, talk, remember, complete tasks, concentrate, comprehend, follow instructions, and get along with others (*id.* at 251, 256). His ability to follow spoken instructions was "OK," but his ability to handle stress or adapt to changes in routine was limited (*id.* at 257).

   E.   The Hearing before the Second ALJ

Plaintiff and Vocational Expert ("VE") Elizabeth Laflamme testified at the February 17, 2015 hearing before the second ALJ (*id.* at 33). In describing his background, Plaintiff testified that he was 51 years old, was not in special education classes in school, and had completed the tenth grade by "cheat[ing] off people" (*id.* at 39, 51, 57). He had worked as a laborer and had

spent approximately seventeen years in an Alabama prison after being convicted of burglary (*id.* at 40-42).

Plaintiff told the ALJ that he was not working and had not looked for work because he had difficulty concentrating and remembering, he heard muffled voices, he saw objects "[o]ut of the corner of [his] eyes," and he was paranoid (*id.* at 41-43, 49, 51, 57, 59, 60, 61, 62, 63, 65). Plaintiff further described his longstanding anxiety around strangers and crowds, although he procured narcotics from people he heard were selling and "people who [stood] by the store" selling drugs (*id.* at 46, 48-51, 56, 57, 65). Plaintiff testified that his medications made him "calmer" (*id.* at 59, 60). However, his treatment provider was going to increase the dosage of two medications because, recently, some symptoms had returned (*id.* at 60).

The ALJ directed VE Laflamme to assume Plaintiff was unable to perform his past job as a laborer, which required the ability to work without close supervision, and posed the following hypothetical question, asking whether the described person could perform any work:

> [A]ssume . . . a person of [Plaintiff's] age . . . who is capable of light work and could have occasional use of his right upper extremity. The job would have to be one in which he remembered and carr[ied] out no more than simple instructions and [had] no more than occasional contact with others.

(*id.* at 66, 67). The VE described two jobs that were available in the national and regional economies for the hypothetical individual: a price marker; and a laundry classifier, which was an unskilled job (*id.* at 68). These jobs, however, would not be available for a person who was off task for at least twenty-five percent of the work day or who was absent more than four days per month (*id.* at 68-69).

F.      The Second ALJ's Decision

In order to qualify for SSI, a claimant must demonstrate that he was "disabled" and of "limited means," as those terms are defined by the Social Security Act (the "Act"). *Splude v.*

*Apfel*, 165 F.3d 85, 87 (1st Cir. 1999). *See* 42 U.S.C. §§ 1381a, 1382. Here, the only question is "whether the ALJ had substantial evidence with which to conclude that Plaintiff did not suffer from a disability." *Bitsacos v. Barnhart*, 353 F. Supp. 2d 161, 165-66 (D. Mass. 2005).

The Act defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). An individual is considered disabled under the Act

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B). *See generally Bowen v. Yuckert,* 482 U.S. 137, 146–49 (1987).

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. *See* 20 C.F.R. § 416.920(a); *see also Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process). The claimant has the burden of proof through step four of the analysis. *See Goodermote*, 690 F.2d at 7. At step five, the Commissioner has the burden of showing the existence of jobs in the national economy that the claimant can perform notwithstanding impairment(s). *See id.* If a hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step. *See* 20 C.F.R. § 416.920(a)(4).

At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of August 13, 2013 (A.R. at 21). *See* 20 C.F.R. § 416.971 *et seq*. At step two, the ALJ found that Plaintiff was severely impaired due to "depression,

schizoaffective/bipolar disorder, [PTSD], flexion deformity of second, third and fourth fingers of right hand, status post gunshot wound to back, [and] substance abuse" (A.R. at 21). *See* 20 C.F.R. § 416.920(c). For purposes of step three, Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. at 25). *See* 20 C.F.R. §§ 416.920(d), 416.925, 416.926. He considered the so-called "paragraph B" criteria applicable to mental health impairments, and found that Plaintiff had a mild difficulty in activities of daily living, and moderate difficulties in social functioning and concentration, persistence, or pace (A.R. at 25). Finally, he found no episodes of decompensation of extended duration (*id.*).

Before proceeding to steps four and five, the ALJ assessed Plaintiff's RFC for use at step four to determine whether he could do past relevant work and, if the analysis continued to step five, to determine if he could do other work. *See* 20 C.F.R. § 416.920(e). "The RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Regulation ("SSR") 96-8p, 1996 WL 374187, at *2 (July 2, 1996). Put another way, "[a]n individual's RFC is defined as 'the most you can still do despite your limitations.'" *Dias v. Colvin*, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting 20 C.F.R. § 416.945(a)(1)).

The ALJ determined that Plaintiff had the RFC to perform light work,[4] with the following limitations:  "he could remember and carry out only simple instructions, have no more than occasional use of his right hand, and have only occasional contact with others" (A.R. at 26).

At step four, the ALJ found that Plaintiff was unable to perform his past relevant work (*id.* at 26).  *See* 20 C.F.R. § 416.965.  However, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform the following jobs that existed in the national and regional economies:  price marker; and laundry classifier (A.R. at 27).  *See* 20 C.F.R. §§ 416.969, 416.969a.  Consequently, the ALJ concluded that Plaintiff was not disabled from August 13, 2013 through March 3, 2015, the date of the decision under review (A.R. at 27-28).  *See* 42 U.S.C. § 416.920(g).

III.    ANALYSIS

A.    Standard of Review

---

[4] The Social Security Administration ("SSA") defines light work as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities.  If someone can do light work, [the SSA] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. § 404.1567(b).

Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(a).

.

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for a rehearing. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law de novo, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *See id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.,* 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.,* 647 F.2d 218, 222 (1st Cir. 1981)). "Complainants face a difficult battle in challenging the Commissioner's determination because, under the substantial evidence standard, the [c]ourt must uphold the Commissioner's determination, 'even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.'" *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 159 (D. Mass. 2010) (quoting *Rodriguez Pagan v. Sec'y of Health & Human Servs.,* 819 F.2d 1, 3 (1st Cir. 1987)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Irlanda Ortiz,* 955 F.2d at 769. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *See Nguyen*, 172 F.3d at 35.

B.    Plaintiff's Objections

Plaintiff alleges that the ALJ made three errors by denying SSI: (1) he failed to explain the inconsistencies between the DDS examiners' and Dr. Carbone's opinions and Plaintiff's RFC;

(2) he failed to adopt the first ALJ's decision in accordance with the principles of res judicata and collateral estoppel; and (3) he failed to give Marcus Foster's opinion controlling weight (Dkt. Nos. 12 & 13).  Each of Plaintiff's objections will be discussed in turn.

        1.        The ALJ's failure to explain omissions of mental limitations from the RFC requires remand.

In pertinent part, the ALJ's RFC limited Plaintiff to performing light work, with the additional limitations of remembering and carrying out only simple instructions and having only occasional contact with others (A.R. at 26, 67).  In making the RFC determination, the ALJ considered the opinions of the DDS consultants and Dr. Carbone (*id.* at 24-25).  Plaintiff seeks remand due to the ALJ's alleged failure to explain the variance between the mental RFC that he adopted and the DDS consultants' assessments of Plaintiff's mental RFC and Dr. Carbone's opinion of his mental impairments (Dkt. No. 13 at 10-13).  Because the ALJ failed to incorporate into the RFC all of Plaintiff's mental limitations identified by the DDS consultants and Dr. Carbone and failed to explain the basis for the omissions, remand is warranted.

        a.        DDS Consultants' RFC Assessments

The DDS consultants, Dr. Langer and Dr. Whitehorn, were "state agency psychological consultants."  *See* SSR 96-6p, 1996 WL 374180, at *1 (July 2, 1996).  Dr. Langer's June 2014 mental RFC assessment mirrored Dr. Whitehorn's January 2014 assessment (A.R. at 94-96, 107-09).  The DDS consultants found Plaintiff moderately limited in:  (1) his ability to understand and remember detailed instructions; (2) his ability to carry out detailed instructions; (3) his ability to maintain attention and concentration for extended periods; (4) his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) his ability to interact appropriately with the general public; (6) his ability to get along with

coworkers and peers without distracting them or exhibiting behavioral extremes; and (7) his ability to respond appropriately to changes in the work setting (*id.* at 94-96, 108-09). Their narrative mental RFC assessments stated that Plaintiff was able to: remember and understand simple tasks; sustain pace and focus on simple tasks for two hour periods during a work day; generally adhere to social norms in a work setting; and handle changes in simple work routines (*id.*). The ALJ afforded the DDS consultants' mental RFC assessments "moderate weight" because they did not examine Plaintiff (*id.* at 25). *See Darsch v. Astrue,* C.A. No. 10-cv-30102-MAP, 2011 WL 1044862, at * (D. Mass. Mar. 18, 2011) (proper not to give great weight to the opinion of the state agency physician who did not examine plaintiff);

b.    Dr. Carbone's Consultative Examination

Although Dr. Carbone examined Plaintiff, his January 14, 2014 evaluation did not include his opinion on Plaintiff's functional limitations in specific areas. However, he reported that: (1) Plaintiff appeared to understand simple concepts, but had more difficulty with complex concepts and got "overwhelmed very easily with much tearfulness during the evaluation;" and (2) Plaintiff's anxiety would impact his ability to focus (A.R. at 296). Dr. Carbone's definitive diagnosis was depressive disorder NOS and PTSD "by history" (*id.*). In addition, he noted that borderline intellectual functioning was "likely" (*id.*). Dr. Carbone assessed Plaintiff's GAF score as 52, which denotes "moderate limitations" in occupational functioning (*id.*). *Nadeau v. Colvin*, Civil Action No. 14-10160-FDS, 2015 WL 1308916, at *12 (D. Mass. Mar. 24, 2015). *See Morey v. Colvin*, C.A. No. 14-433M, 2015 WL 9855873, at *14 (D.R.I. Oct. 5, 2015), *report and recommendation adopted,* C.A. No. 14-433-M-PSA, 2016 WL 224104 (D.R.I. Jan. 19, 2016) ("[A]djudicators may continue to receive and consider GAF scores as 'opinion evidence,' despite the rejection of the use of GAF by DSM–5."). Although the ALJ found that Dr. Carbone was

"well-trained in the field on which he opined," the ALJ afforded Dr. Carbone's opinion "moderate weight" based on his single examination of Plaintiff (A.R. at 24). *See* 20 C.F.R. § 404.1527(c)(2)(i), (ii) (length of the treatment relationship, frequency of examination, and nature and extent of treatment relationship are factors considered in assigning weight to medical opinions). "Moderate" weight was the highest weight the ALJ assigned to any of the record opinions (A.R. at 24-25).

c.    The ALJ's RFC.

The ALJ is responsible for determining a claimant's RFC, *see* 20 C.F.R. § 404.1546, and is required to consider all of the relevant record evidence when making that assessment. *See* SSR 96-9p, 1996 WL 374184, at *5 (July 2, 1996). "In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's [mental] impairments, even those that are not 'severe.'" *Id.* "While a 'not severe' impairment[] standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim." *Id.*

"[T]he ALJ must specify the evidentiary basis for his RFC determination." *Canfield v. Apfel*, No. Civ. 00-267-B, 2001 WL 531539, at *5 (D.N.H. Apr. 19, 2001). *See White v. Sec'y of Health and Human Servs.,* 910 F.2d 64, 65 (2d Cir. 1990) (noting that the failure to specify a basis for the RFC determination is a sufficient reason to vacate a decision of the Commissioner); *SSR* 96–8p, 1996 WL 374184, at [*]7. "In determining a claimant's RFC, an administrative law judge is not free to substitute [his] judgment for that of medical or psychological experts and/or to assess RFC on the basis of raw medical evidence." *Dubriel v. Astrue*, Civil No. 08-406-B-W, 2009 WL 1938986, at *2 (D. Me. July 6, 2009), *report and recommendation adopted,* Civil No.

08-406-B-W, 2009 WL 2242393 (D. Me. July 24, 2009). *See, e.g., Nguyen,* 172 F.3d at 35 ("The ALJ's findings of fact are conclusive when supported by substantial evidence, but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.") (citation omitted). The ALJ must consider opinions when crafting the RFC and must explain the weight afforded to them. *See* SSR 96–8p, 1996 WL 374184, at *9 (an administrative law judge can reject a treating-source opinion as to RFC but "must explain why the opinion was not adopted"); SSR 96–6p, 1996 WL 374180, at *1 ("Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review. . . . Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.").

The ALJ's RFC in the instant case limited Plaintiff to remembering and carrying out only simple instructions (A.R. at 26). This restriction is supported by the DDS consultants' identification of Plaintiff's moderate limitations in these areas and Dr. Carbone's observation that Plaintiff "appeared to understand simple directions" (*id.* at 94, 108, 296).

The RFC also restricted Plaintiff to having "occasional contact with others" (*id.* at 26). This restriction reflected the DDS consultants' opinions that Plaintiff had moderate limitations in his ability to interact appropriately with the general public and "to get along with coworkers or peers without distracting them or exhibiting behavioral extremes," but "could now adhere to social norms in a work setting" (*id.* at 95, 109). Dr. Carbone noted that, at the time of the

examination, Plaintiff was living with his stepdaughter, with whom he had a good relationship, and her four children (*id.* at 295).

> d. The ALJ's Failure to Address Other Identified Limitations

Plaintiff contends that although the ALJ gave moderate weight to the opinions of the DDS consultants and Dr. Carbone and accepted some of the limitations they identified, he erred by excluding from his RFC, without explanation, identified limitations in Plaintiff's ability to maintain concentration, persistence, or pace and to adapt to changes in the work setting. As to the first unaddressed limitation, the DDS consultants' narrative indicated that Plaintiff was able to "sustain pace and focus on simple tasks for two hour periods during the workday" while Dr. Carbone observed that Plaintiff got "overwhelmed very easily" and that his anxiety would "certainly impact his ability to focus" (A.R. at 95, 109, 296). In assessing the "paragraph B" criteria at step two of the sequential evaluation process, the ALJ determined that Plaintiff had moderate difficulties maintaining concentration, persistence, or pace (*id.* at 25). When formulating Plaintiff's RFC, the ALJ indicated that the RFC "reflects the degree of limitation [he] . . . found in the 'paragraph B' mental function analysis" (*id.* at 26).[5] Yet the RFC omits a limitation on concentration, persistence, or pace and offers no explanation as to the apparent

_____

[5] "[T]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the [Psychiatric Review Technique Form]." SSR 96-8p, 1996 WL 374184, at *4. "It is the more detailed assessment prepared . . . for purposes of an RFC assessment which is relevant to the determination of whether the ALJ's RFC findings are supported by substantial evidence." *Warzeka v. Colvin*, Case No. 15-1118-SAC, 2016 WL 3902751, at *2 n.1 (D. Kan. July 19, 2016).

variance between the opinion evidence and the RFC.[6]  Further, the ALJ failed to discuss the

apparent discrepancy between the DDS consultants' opinions that Plaintiff "can handle changes

in simple work routines," Dr. Carbone's assessment that Plaintiff was easily "overwhelmed," and

the RFC, which made no mention of this limitation (*id.* at 26, 96, 109, 296).

The ALJ may have had reasons for accepting certain limitations while rejecting others.

However, he was required to "explain why he rejected some limitations contained in a RFC

assessment from a medical source while appearing to adopt other limitations contained in the

assessment." *Warzeka v. Colvin*, Case No. 15-1118-SAC, 2016 WL 3902751, at *4 (D. Kan.

July 19, 2016).  *See* SSR 96–8p, 1996 WL 374184, at [*]7 ("The RFC assessment must always

consider and address medical source opinions.  If the RFC assessment conflicts with an opinion

from a medical source, the adjudicator must explain why the opinion was not adopted."); SSR

96-9p, 1996 WL 374184, at *7 ("The RFC assessment must include a discussion of why reported

symptom-related functional limitations and restrictions can or cannot reasonably be accepted as

consistent with the medical and other evidence.").  The ALJ's cursory explanations for affording

the DDS consultants' and Dr. Carbone's opinions moderate weight does not adequately explain

the basis for omitting some of the impairments that they identified and the court is not entitled to

speculate as to the reasons for the ALJ's apparent rejection of portions of the experts' opinions

when he crafted Plaintiff's RFC.  His failure to offer an explanation constitutes error warranting

remand.  *See Dube v. Astrue,* 781 F.Supp.2d 27, 34–36 (D.N.H. 2011) (ALJ's decision reversed

for failure to discuss findings by state agency consultant that contradicted ALJ's conclusion);

---

[6] Although Plaintiff testified that he could not work because he was unable to "'stay focused'"
and the ALJ did not find him "entirely credible" (A.R. at 24, 26), "[a] negative credibility
assessment, standing alone, is not a proper basis for an RFC finding." *Dubriel v. Astrue*, Civil
No. 08-406-B-W, 2009 WL 1938986, at *3 n.2 (D. Me. July 6, 2009).

*Crosby v. Heckler*, 638 F. Supp. 383, 385–86 (D. Mass. 1985) ("The ALJ cannot reject evidence for no reason, or for the wrong reason, and must explain the basis for his findings. Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation.").

The Commissioner's contrary arguments are unpersuasive. Her contention -- that "the ALJ's RFC is consistent with the RFC of the state agency experts" -- is contradicted by the DDS consultants' opinions that Plaintiff was moderately limited in maintaining concentration, persistence, or pace and in adapting to changes in a simple work routine, which are absent from the RFC (Dkt. No. 18 at 10). Likewise, her contention that "Dr. Carbone's observations that the Plaintiff might have difficulty with focus and be easily overwhelmed does not mean he did not think Plaintiff could work" misses the point. The ALJ did not incorporate into the RFC the limitations Dr. Carbone identified and failed to explain his reasons for rejecting those limitations.[7]

Remand is necessary for reconsideration of the RFC in view of the DDS consultants' and Dr. Carbone's opinions regarding Plaintiff's limitations in concentration, persistence, or pace and ability to adapt to workplace changes, and the ALJ's step three findings regarding the severity of Plaintiff's mental impairments. The ALJ's findings must explain the discrepancies between the opinions, his step three findings, and the RFC.

Despite the remand order, the court shall address the additional issues raised by Plaintiff.

    2.      The second ALJ was not required to adopt the first ALJ's disability determination.

---

[7] The Commissioner has not argued harmless error with regard to Plaintiff's contention and, therefore, has waived this argument, which, in any event, would be unpersuasive. *See Johnson v. Comm'r of Soc. Sec.*, No. 2:14-cv-306, 2015 WL 686298, at *8 (S.D. Ohio Feb. 18, 2015).

Plaintiff argues that, as a matter of law, the first ALJ's RFC determination was binding on the second ALJ based on the principles of res judicata (Dkt. No. 13 at 8-9). The Commissioner counters that the second ALJ correctly declined to adopt the first ALJ's decision because: (1) the SSI benefits that the first ALJ awarded were terminated; and (2) the record that the second ALJ considered showed improvement in Plaintiff's condition after ALJ Stolfo's decision. The Commissioner's arguments are persuasive.

Plaintiff first applied for SSI benefits on July 16, 2010 alleging an onset of disability on May 2, 2008 (A.R. at 87). He received a favorable decision from ALJ Stolfo on February 24, 2012 (*id.* at 87). In reaching her decision, ALJ Stolfo reviewed Plaintiff's records from April 2010 through January 2012 (*id.* at 83-85). At step two of the sequential evaluation process, she found that Plaintiff suffered from the severe impairments of "schizoaffective disorder (bipolar type), polysubstance dependence, intermittent explosive disorder, [PTSD and] right hand pain status post-surgery," but that none of these impairments met or were medically equal to the severity of a listed impairment at step three (*id.* at 81). Based upon Plaintiff's treatment providers' records and ALJ Stolfo's credibility assessment of Plaintiff's subjective complaints, she determined that Plaintiff had the following RFC:

> Plaintiff [is able to] perform a full range of work at all exertional levels but with the following nonexertional limitations: The [Plaintiff] would be limited to occasional handling and fingering with the right hand. The [Plaintiff] would be limited to unskilled with simple, one and two step tasks. The [Plaintiff] could be limited to simple, routine, repetitive tasks. The [Plaintiff] would be limited to low stress defined as no decision making required. The [Plaintiff] would be limited to low stress defined as no changes in the work setting. The [Plaintiff] could have no judgment required on the job and no production rate pace work but rather goal-oriented work. The [Plaintiff] would need close supervision, as defined as a supervisor checking his work five times per day. The [Plaintiff] could not interact with the public. The [Plaintiff] would be limited to occasional interaction with coworkers. The [Plaintiff] would be limited to dealing with things rather than people.

(A.R. at 81-82 & n.1). Because Plaintiff could not perform his past relevant work and because no jobs existed in the national and regional economies for a person with Plaintiff's age, education, work experience, and RFC, ALJ Stolfo concluded that Plaintiff had been disabled since May 2, 2008 and awarded benefits based on Plaintiff's application date of July 2010 (*id.* at 86-87). Benefits became payable in August 2010. *See* 20 C.F.R. § 416.335.

The parties agreed to supplement the record with the history of the termination of the benefits the first ALJ awarded to Plaintiff and with the SSA Program Operations Manual System (POMS) DI 11011.0001, which discusses collateral estoppel (Dkt. No. 18 at 2 n.3; 18-1; 18-2). After ALJ Stolfo issued her decision, the SSA's field office's review of "the nondisability requirements for the[] payments" revealed that Plaintiff was married on August 6, 2011 and that his spouse was receiving Social Security benefits (Dkt. No. 18-1 ¶ 4(b)(c); A.R. at 87). Plaintiff's spouse's Social Security benefits were considered in determining that Plaintiff did not meet the financial eligibility criteria for SSI from the date of his marriage in August 2011 (*id.* at ¶ 4(c)). Consequently, Plaintiff was deemed ineligible for SSI benefits beginning in September 2011 and his benefits were suspended as of that date (*id.* at ¶ 4(b), (d), (e)). *See* 20 C.F.R. § 416.1323. In September 2012, Plaintiff's record was automatically terminated because his benefit payments had been suspended for twelve consecutive calendar months (*id.* at ¶ 4(f)). *See* 20 C.F.R. § 416.1335 ("We will terminate your eligibility for benefits following 12 consecutive months of benefit suspension for any reason beginning with the first month you were no longer eligible for regular SSI cash benefits . . . ."). On August 13, 2013, Plaintiff submitted the application under consideration here (A.R. at 19).

Addressing the application of collateral estoppel to an ALJ's determination, POMS DI 11011.001 states: "a prior favorable determination or decision made by SSA or the court must

be adopted for the same period on the new claim unless the prior favorable determination can be reopened under the rules of administrative finality" (Dkt. No. 18-2 at 1). However, if a title XVI record is "currently in terminated status," as here, the collateral estoppel rule of POMS DI 11011.001 does not apply (*id.*).[8]

Notwithstanding the conclusion dictated by the collateral estoppel rule stated in POMS DI 11011.001, the principles of res judicata did not bind the second ALJ to the first ALJ's decision. Res judicata prescribes that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were raised or could have been raised in the action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). The Act addresses res judicata by directing that "[t]he findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing." 42 U.S.C. § 405(h). The regulations advise that res judicata applies when the Commissioner has made a previous final decision based "on the same facts and on the same issue or issues." 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1).

"The crucial question in determining whether the ALJ in the second proceeding was bound by the RFC finding in the first proceeding is whether there was improvement in Plaintiff's condition between the two decisions." *Mantilla v. Colvin*, Civil Action No. 15-11913-FDS, 2016 WL 3882838, at *5 (D. Mass. July 13, 2016). "Although the First Circuit has not decided any cases [that address the res judicata principle at issue here], there are several cases from other circuits that speak to the issue." *Id.* (citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997); *Rucker v. Chater*, 92 F.3d 492 (7th Cir. 1996); *Chavez v. Bowen*, 844 F.2d 691 (9th

---

[8] "Title XVI of the Social Security Act governs applications for . . . SSI." *Fischer v. Colvin*, 831 F.3d 31, 35 n.3 (1st Cir. 2016).

Cir. 1988); *Lively v. Sec'y of Health & Human Servs.*, 820 F.2d 1391 (4th Cir. 1987)). *See also*

*Albright v. Comm'r of the Soc. Sec. Admin.*, 174 F.3d 473, 476-78 (4th Cir. 1999) (clarifying

*Lively*).

Two related factors emerge from these cases that are relevant to the court's decision here:

the length of time between the first and second applications; and whether the second ALJ

considered significant new evidence that demonstrated improvement in Plaintiff's condition. *See*

*Mantilla*, 2016 WL 3882838, at *5; *Frost v. Barnhart*, No. 03-215-P-H, 2004 WL 1529286, at

*4 (D. Me. May 7, 2004). Plaintiff filed the second application almost one and one-half years

after the first ALJ issued her decision (A.R. at 19, 87). Because of the passage of a significant

period of time, the second ALJ was not bound by the first ALJ's decision. *Compare Rucker*, 92

F.3d at 495 (given the two-year gap between the first decision and plaintiff's subsequent

application, the previous RFC determination was not conclusive evidence of plaintiff's RFC on

the later date). *Contrast Mantilla*, 2016 WL 3882838, at *6 ("Because of the relatively short

amount of time [six months] between the final agency action in [plaintiff's] first case and the

filing of her second application, this case falls into the category of situations in which the initial

RFC finding is 'entitled to some res judicata consideration.'") (quoting *Chavez*, 844 F.2d at 694).

As to the second factor, the second ALJ considered ALJ Stolfo's decision, concluded that

he was "not bound by [her] findings," reviewed "the evidence found in the current application's

file," which included the 2010 to 2012 records that ALJ Stolfo cited as well as new records, and

determined that Plaintiff was not disabled based on improvements in his condition since

February 2012 (A.R. at 22 & n.4, 27-28, 31-32, 83-84, 272-286, 314-367). *See Mantilla*, 2016

WL 3882838, at *6 ("The second ALJ was bound by the initial decision unless he made a

specific finding as to an improvement in plaintiff's condition"); *Trofimuk v. Comm'r of Soc. Sec.*,

No. 2:12-cv-2482-KJN, 2014 WL 794343, at *5 (E.D. Cal. Feb. 27, 2014) ("All of the medical evaluators considered by the ALJ in making her determination in the present case were conducted *after* the prior favorable determination. Therefore, the ALJ based her determination entirely on new and material evidence and was not required to give the findings from the prior adjudication preclusive effect."); *Zavilla v. Astrue*, Civil Action No. 09-133, 2009 WL 3364853, at *13 (W.D. Pa. Oct. 16, 2009) ("The Court is persuaded . . . that the doctrine of res judicata does not bind a subsequent ALJ to findings and decisions of an earlier ALJ when a claimant seeks benefits during a subsequent period of time.").

The second ALJ adequately explained the basis for concluding that Plaintiff's condition had improved since ALJ Stolfo's 2012 decision (A.R. at 22 n.4). *See Frost*, 2004 WL 1529286, at *4. *Contrast Kimmins v. Colvin*, Case No. 12-cv-4206-YGR, 2013 WL 5513179, at *9 (N.D. Cal. Oct. 4, 2013) (ALJ committed legal error by failing to provide an "explanation or reason . . . for ignoring the prior finding of disability"). The results of Plaintiff's mental status examination that VPS conducted on July 1, 2014 showed the following: Plaintiff experienced auditory hallucinations occasionally, although he did not understand them; his mood was stable; his thought processes were logical and rational; he was oriented x 3; his behavior, speech, affect, and thought content were within normal limits; and he reported that his medications were working (A.R. at 290). On July 24, 2013, Plaintiff's VPS therapist Glenroy Bristol noted that Plaintiff's "mood was euthymic with bright affect, . . . [he] did not express or exhibit signs of psychosis, [and his] thoughts were clear, logical, organized, and reality based" (*id.* at 22, 287). On May 4, 2014, NP Ellis' psychiatric assessment of Plaintiff at Caring Health Center indicated that he was "[n]egative" for depression and anxiety. Her evaluation of Plaintiff's psychological condition mirrored Mr. Bristol's July 2013 assessment (*id.* at 23, 310-11). On September 11, 2014,

Plaintiff told Peter Landstrom, RNP of CHD that, although he heard unintelligible voices, he was feeling well and his medication was effective (*id.* at 23, 380). RNP Landstrom noted that plaintiff was euthymic, oriented to all spheres, and displayed speech and thought processes that were within normal limits (*id.* at 381-82). In addition, Plaintiff's memory was intact, his attention and concentration were good, and his judgment and insight were fair (*id.* at 381). On October 6, 2014, NP Ellis reported that Plaintiff displayed normal mood, affect, judgment, and thought content (*id.* at 23, 398).

Because the second ALJ relied upon assessments that showed Plaintiff's condition had improved after the first ALJ's decision, he was not bound by the first ALJ's decision, and remand on the basis of res judicata is not warranted.

3.      The ALJ did not err by assigning "little weight" to Marcus Foster's opinion.

Plaintiff asserts that the ALJ erred by failing to give the opinion of Marcus Foster, his therapist, controlling weight (Dkt. No. 13 at 13-17). The ALJ assigned "little weight" to Foster's opinion based on the facts that his training was less than Dr. Carbone's, he did not treat Plaintiff for a long period of time, and "it is not readily apparent which medically acceptable clinical or laboratory diagnostic techniques, if any, [he] based [his] views on" (A.R. at 24).

As a preliminary matter, the Social Security regulations preclude an ALJ from giving controlling weight to opinions from those who are not "acceptable medical sources." SSR 06–03p, 2006 WL 23329939, at *2 (Aug. 9, 2006) ("Only 'acceptable medical sources' can be considered treating sources as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight."). Because Foster, a therapist, is not an "acceptable medical source" under the regulations, his opinions are not entitled to controlling weight. *See* 20 C.F.R. 404.1513(d)(1) (defining "other sources"); *see also, e.g., Cappuccio v. Colvin*, CIVIL

ACTION NO. 14-10152-JGD, 2015 WL 5886186, at *9 (D. Mass. Oct. 8, 2015) ("a therapist or licensed social worker . . . is not considered an 'acceptable medical source' for purposes of the disability analysis").

However, Foster is an "other source," whose opinion must be appropriately weighted. An ALJ may not "ignore 'other medical sources' or fail to adequately explain the weight given to such evidence." *Taylor v. Astrue,* 899 F. Supp. 2d 83, 88 (D. Mass. 2012). "Thus, although 'other medical sources' are not entitled to controlling weight and an administrative law judge is not required to provide 'good reasons' for the weight assigned to such opinions nor consult the factors listed in 20 C.F.R. §§ 416.927(C)(2)-(6), [the ALJ] still must adequately explain his treatment of the opinion so that a reviewer can determine if the decision is supported by substantial evidence." *Id.* at 88–89. SSR 06-03p articulates the factors used to evaluate the opinions of "other medical sources." *See* SSR 06-3p, 2006 WL 23329939, at *4-5. These factors include:

> [1] How long the source has known and how frequently the source has seen the individual; [2] How consistent the opinion is with other evidence; [3] The degree to which the source presents relevant evidence to support an opinion; [4] How well the source explains the opinion; [5] Whether the source has a specialty or area of expertise related to the individual's impairment(s); and [6] Any other factors that tend to support or refute the opinion.

*Id.* "Not every factor for weighing opinion evidence will apply in every case." *Id.* at *5.

Here, the ALJ's decision to afford "little weight" to Foster's opinions is adequately explained and supported by enumerated factors. *See id.* at *6. First, the ALJ correctly noted that Foster only had treated Plaintiff once per week for approximately ten weeks at the time he completed the Mental Impairment Questionnaire (A.R. at 24, 305, 308). *See* SSR 06-03p, 2006 WL 23329939, at *4. Second, Foster failed to explain the basis for his opinion or present relevant supporting evidence (A.R. at 24). Indeed, the majority of Foster's report consists of

check marks on the questionnaire (*id.* at 306-08). *See Berrios Lopez v. Sec'y of Health & Human Servs.*, 951 F.2d 427, 431 (1st Cir. 1991) (reports containing the mere checking of boxes are entitled to relatively little weight). Third, Plaintiff failed to sustain his burden of establishing Foster's area of expertise. *See* 06-03p, 2006 WL 2329939, at *4. Finally, the record evidence, including Dr. Carbone's and the DDS consultants' opinions and the treatment records, contradicted Foster's opinion. *See Montero v. Colvin*, Civil No. 12-cv-412-JL, 2013 WL 4042424, at *3 (D.N.H. Aug. 8, 2013). Foster found Plaintiff had "marked" restriction of his daily living activities and difficulties in social functioning, and "extreme" difficulties in maintaining concentration, persistence, or pace (A.R. at 305). On the other hand, the DDS consultants opined that Plaintiff's daily living and social functioning limitations were "moderate" as were his deficiencies in maintaining concentration, persistence, or pace (*id.* at 93, 107). Foster assigned a GAF score of 45, while Dr. Carbone indicated a GAF score of 52 and therapist Glenroy Bristol assigned a GAF score of 56 (*id.* at 296, 305, 325). The treatment records of Bristol, NP Ellis, and RNP Landstrom, which were discussed earlier, further undermine Foster's opinion (*id.* at 22, 287, 310-11, 380-82, 398). In addition, Foster's opinion was internally inconsistent. Despite noting Plaintiff had a "positive response" to medication and therapy, he identified eighteen signs and symptoms that Plaintiff exhibited (*id.* at 305, 306).

It was up to the ALJ to resolve conflicts in the evidence. *See Irlanda Ortiz*, 955 F.2d at 769. The court finds that the ALJ reasonably accorded little weight to Foster's opinions, and sufficiently explained the basis for his decision. Accordingly, the Plaintiff presents no basis for a remand on this issue.

IV.    CONCLUSION

Because the ALJ determined Plaintiff's RFC without explaining his treatment of relevant

evidence, the court is unable to conclude that his decision is supported by substantial evidence.

Accordingly, as to Plaintiff's objection # 1 as described herein, Plaintiff's Motion for Summary

Judgment (Dkt. No. 12) is GRANTED, and Defendant's Motion to Affirm the Commissioner's

Decision (Dkt. No. 17) is DENIED, the ALJ's decision is vacated pursuant to sentence four of 42

U.S.C. § 405(g), and the case is remanded for further proceedings in accordance with this

Memorandum and Order.

It is so ordered.

Dated:  September 29, 2017                        /s/ Katherine A. Robertson
                                                 KATHERINE A. ROBERTSON
                                                 United States Magistrate Judge